## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Renee A. Parker, | ) |
| | ) |
| 619 Park Road, N.W. | ) |
| Washington, D.C. 200010 | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| vs. | ) |
| | ) |
| Loretta E. Lynch, the Attorney General of the | ) |
| United States, | ) |
| | ) |
| 950 Pennsylvania Avenue, N.W. | ) |
| Washington, D.C. 20530 | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

Civil Action No. _____

## COMPLAINT AND DEMAND FOR JURY TRIAL

## I

## INTRODUCTION

1.     Plaintiff Renee A. Parker, an African-American, was subjected to racial discrimination and harassment from the time that Dayle Elieson and Karen Winzenburg became her supervisors in 2012 until those same supervisors orchestrated her removal from federal service in late 2015.  Mss. Elieson and Winzenburg also retaliated against plaintiff for filing an EEO complaint regarding their discriminatory behavior on April 24, 2014.  Mss. Elieson and Winzenburg's unlawful behavior eventually culminated in plaintiff's termination from federal service on August 4, 2015.

2.     Plaintiff alleges both discrimination on the basis of race and retaliation for engaging in protected activity.  Suit is brought under Title VII of the Civil Rights Act of 1964,

42 U.S.C. 2000e, *et seq.*, and implementing regulations.  Plaintiff seeks injunctive relief and damages.

3.      Plaintiff's allegations are consistent with the testimony of all other African-Americans—including plaintiff's former supervisor—who worked under the same supervisors during the same period.  All three report being subjected to racial discrimination and harassment.  Two of the three have left the section as a result.  The third has filed her own complaint against Mss. Elieson and Winzenburg.

II

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction over this case based on 28 U.S.C. 1331 (federal question) and on Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-5(f)(3).

5.      Plaintiff has filed two EEO complaints and exhausted her administrative remedies.

6.      On June 4, 2014, plaintiff filed her first EEO complaint with the Department of Justice's Executive Office for United States Attorneys ("EOUSA") (EOUSA Agency No. USA-2014-00538).   EOUSA accepted the complaint and assigned it for investigation.   The investigation was completed on December 1, 2014.

7.      On October 5, 2015, plaintiff filed her second EEO complaint with EOUSA (EOUSA Agency No. USA-2015-02124).  EOUSA accepted the complaint on assigned it for investigation.  The investigation was completed on January 26, 2016.

8.      This Court has jurisdiction over EOUSA Agency No. USA-2014-00538 because the agency has issued a final decision and no administrative appeal has been filed.  *See* 42 U.S.C. 2000e-16(c); 29 C.F.R. 1614.407.  Fewer than 90 days have elapsed since plaintiff received the final agency decision on February 8, 2016.  *See* 29 C.F.R. 1614.407(1).

2

9.     This Court has jurisdiction over EOUSA Agency No. USA-2015-02124 because the agency has issued a final decision and no administrative appeal has been filed.  *See* 29 C.F.R. 1614.310.  Fewer than 30 days have elapsed since plaintiff received the final agency decision on April 15, 2016.

10.    Venue lies in this Court pursuant to 28 U.S.C. 1391(e) because defendant's principal offices are in the District of Columbia, plaintiff was employed in the District of Columbia, plaintiff's supervisors had their offices in the District of Columbia, and the employment decisions affecting plaintiff were made in the District of Columbia.

## III

## PARTIES

**A.     Plaintiff**

11.    Plaintiff Renee A. Parker is a United States citizen who currently resides at 619 Park Road, N.W., Washington, DC 20010.

12.    Ms. Parker worked as a Program Support Assistant in the Evaluation and Review Staff (EARS) of the Executive Office for United States Attorneys in the United States Department of Justice from November 2007 until she was terminated on August 4, 2015.

13.    When terminated, Ms. Parker was a GS-7, step 9.

**B.     Defendant**

14.    Loretta E. Lynch is the Attorney General of the United States, head of the United States Department of Justice ("DOJ"), and chief law enforcement officer of the federal government.  DOJ is an executive agency.  DOJ's headquarters are in Washington, DC.  Ms. Lynch is sued in her official capacity.

## IV

## FACTS

15.     Ms. Parker joined the federal service in 1991.

16.     Ms. Parker joined the staff of EARS in 2007 as a GS-7.  At the time that Ms. Parker joined the EARS staff, her immediate supervisor was David Tait.  Mr. Tait is white.

17.     In April 2009, Ms. Parker received a Performance Award for 2008.

18.     Ms. Parker's annual performance review for 2009 was completed in February 2010.  David Tait served as the Rating Official for this review.  Ms. Parker was rated against three metrics, or Performance Elements ("PE's"): Coordinates the EARS pre-evaluation process; provides clerical and administrative support to EARS staff; plans and executes special projects.

19.     Ms. Parker received an overall rating of "Outstanding" in her 2009 review, and likewise was rated "Outstanding" with respect to all three PE's.

20.     On May 20, 2010, Ms. Parker received a Performance Award for 2009.  Ms. Parker was nominated for this award by David Tait.

21.     Ms. Parker's annual performance review for 2010 was completed in January 2011.  David Tait served as the Rating Official for this review.  Ms. Parker was rated against the same three PE's as in 2009.

22.     Ms. Parker was rated "Outstanding" with respect to each individual PE, and "Outstanding" overall.  With respect to the first PE—coordinates the EARS pre-evaluation process—Mr. Tait noted that "a few instances were noted in the memos to United States Attorneys which contained incorrect names or titles."  Mr. Tait did not consider the occurrence of these mistakes to degrade Ms. Parker's performance from the Outstanding level.

23.     In March 2011, Ms. Winzenburg joined the EARS staff as Assistant Administrative Program Manager.  In this capacity, she had no direct supervisory authority over Ms. Parker or any of the staff members.

24.     Ms. Parker's annual performance review for 2011 was completed in February 2012.  Debora Cottrell, at this time Ms. Parker's direct supervisor, served as the Rating Official for this review.  Ms. Parker was rated against the same three PE's as in 2010.

25.     Ms. Parker was once again rated "Outstanding" overall.  She received a rating of "Outstanding" with respect to her first and third PE's and a rating of successful with respect to her second PE.  In her review, Ms. Cottrell noted that "Ms. Parker possess[es] the talent of frankly communicating with colleagues without showing any disrespect. * * * Ms. Parker is always eager to learn and is receptive to others' ideas and thoughts."  Ms. Cottrell further stated that "Ms. Parker showed that she could handle stressful situations with a great deal of ease and was capable of coming up with solutions for problems without much assistance from senior staff members."

26.     On May 7, 2012, Ms. Elieson assumed her position as Assistant Director of EARS staff.

27.     When Ms. Elieson arrived at EARS, there were four African-American employees in the section: Allison Smith, Katrina Jones, Ms. Parker, and Ms. Cottrell, the Administrative Program Manager.  All four allege that they were subjected to racial harassment, discrimination, and hostility by Mss. Elieson and Winzenburg.

28.     When Ms. Elieson came to EARS, she appeared to make it her mission to make drastic changes in the office.   Ms. Winzenburg joined eagerly in these efforts and soon became Acting Administrative Program Manager after Ms. Cottrell left EARS.

5

29.     These changes were aimed at the African-American support staff.  Ms. Elieson had immediately and summarily decided that they were not working hard enough or adequately serving their customers, *i.e.*, the rest of the EARS staff.  Although Ms. Cottrell, who is African-American, was then the supervisor of the support staff as Administrative Program Manager, Ms. Elieson did not consult her with regards to either her conclusions that the support staff's performance was inadequate, nor with regards to the actions that Ms. Elieson took in response.

30.     Ms. Elieson imposed disciplinary actions on the African-American support staff without even consulting their then-supervisor Ms. Cottrell.

31.     Ms. Elieson made changes in the performance evaluations of African-American members of the support staff drafted by Ms. Cottrell to give them less favorable evaluations.  Ms. Cottrell concluded that these changes had no factual support.  Ms. Elieson sat with Ms. Cottrell during the mid-year reviews of the African-American members of the support staff.  No supervisor of Ms. Cottrell had done this in her 20 years as a supervisor.

32.     Ms. Elieson instructed Ms. Cottrell to monitor closely two African-American members of the support staff, including Ms. Parker.  Ms. Cottrell concluded that Ms. Elieson wished to get rid of the two employees.

33.     Ms. Elieson's effort to rid the office of African-American staff has been successful.  Katrina Jones transferred to a different job due to the constant racial discrimination, and Ms. Cottrell left after filing and settling a complaint of discrimination.  Ms. Smith is now the only African-American left.

34.     Mss. Elieson and Winzenburg imposed different rules for African-American and white employees.  The rules for all the support staff supposedly allowed 30 minutes for lunch

and required them to inform a supervisor before leaving their desk.  Other absences from the desk were limited to 15 minutes.  These rules were applied only to the African-American staff.

35.     Ms. Parker was assigned the duty of answering the telephone for the office.  If she was not available, the task was assigned to another African-American member of the support staff, but never to a white member.  If no African-American member of the support staff was available, Ms. Winzenburg would criticize the African-American members for failing to ensure that the telephone was answered rather than simply asking a white member to answer it.

36.     Mss. Elieson and Winzenburg often bullied the African-American employees, including Ms. Parker, talking to them in a belittling and hostile way, sometimes communicating entirely through peremptory gestures.

37.     In June 2012, Ms. Parker received a Sustained Superior Performance Award for her performance in 2011.  Ms. Cottrell nominated Ms. Parker for this award.

38.     Ms. Parker's annual performance review for 2012 was completed in March 2013.  Dayle Elieson served as the Rating Official for this review.  Ms. Parker was, for the first time, rated against five PE's, with the addition of a PE for "Professionalism" and one for "Client and Organization Support."

39.     Ms. Elieson rated Ms. Parker "Successful" on all five PE's.  Ms. Parker's review does not indicate why her performance was no longer rated "Outstanding."

40.     In February 2013, Ms. Winzenburg arranged for Ms. Parker to participate in an "experience exchange" program with the Freedom of Information Act ("FOIA") section of EOUSA.  Prior to accepting the reassignment, Ms. Parker went to speak with individuals from the FOIA section about what her job there would entail.  After being informed that the project involved only the bulk scanning of documents—which had been slated for completion by an

intern prior to that intern's departure—Ms. Parker decided that this "experience exchange" in fact offered her no experience valuable to her career progression and declined to take the assignment.

41.     Soon thereafter, Ms. Parker was scolded by Ms. Winzenburg because, according to Ms. Winzenburg, the staff from FOIA had reported that their interview with Ms. Parker went poorly, with Ms. Parker exhibiting a negative and hostile attitude.  This surprised Ms. Parker who, although she did not ultimately take the job, felt that the interview had gone well. Therefore, Ms. Parker went down to the FOIA office to apologize to the staff members who had interviewed her for any offense she might have inadvertently caused.  However, the FOIA staff member to whom she spoke was similarly surprised by the accusation, as the FOIA staff had also felt that the interview went well and, in fact, had expected that Ms. Parker would take the  job.

42.     This unfounded rumor, which Ms. Parker believes originated with either Ms. Elieson or Ms. Winzenburg, was communicated to Wayne Gibson, Chief of Planning, Evaluation, and Performance, and perhaps other employees, and harmed Ms. Parker's reputation in the office.

43.     Ms. Parker's use of sick leave was closely scrutinized.  Ms. Parker was told by Ms. Winzenburg not to take her sick leave beyond the exact length of the doctor's appointment. This is not a DOJ requirement.

44.     In July 2013, Ms. Winzenburg called Ms. Parker at home to interrogate Ms. Parker about her use of approved sick leave.   Mr. Gibson has stated that such action is inappropriate.  To Ms. Parker's knowledge, Ms. Winzenburg has not similarly interrogated other employees about their sick leave.

45.    On July 9, 2013, Ms. Parker received an e-mail from the EOUSA Office of Administration which indicated that she was eligible for routine and situational telework.   On August 28, 2013, Ms. Parker submitted applications for situational and routine telework.

46.    On August 25, 2013, Ms. Elieson nominated Ms. Parker for a Time Off Award.

47.    On or before September 3, 2013, Mr. Gibson formally requested that a Letter of Reprimand that Ms. Parker received in 2012 be removed from her personnel file.   On September 3, 2013, Mr. Gibson e-mailed Mss. Parker and Elieson to inform them that he had requested the removal of the reprimand from Ms. Parker's file.

48.    On September 17, 2013, Ms. Winzenburg sent an e-mail to Ms. Parker stating that she would like to discuss Ms. Parker's request to telework.

49.    Shortly thereafter, Ms. Winzenburg asked Ms. Parker to answer a number of questions regarding her telework application.   These questions were in addition to those mandated by DOJ.

50.    On December 3, 2013, Ms. Winzenburg sent an e-mail to Ms. Parker requesting that Ms. Parker provide her with a list of duties she would accomplish while teleworking.   Ms. Winzenburg stated that she and Ms. Parker could only discuss Ms. Parker's telework request after Ms. Winzenburg received this information.

51.    Ms. Parker submitted the requested list in December 2014 and again on February 26, 2014.

52.    On March 12, 2014, Ms. Winzenburg informed Ms. Parker via e-mail that she would not have time to discuss Ms. Parker's request for regular telework until after the upcoming United States Attorneys' conference.

53.     On March 28, 2014, Ms. Winzenburg informed Ms. Parker that her request for routine telework was denied.  According to Ms. Winzenburg, she had made "further inquiry" of the EOUSA Administrative Office and determined that Ms. Parker has been designated telework-eligible in error.  Ms. Winzenburg further stated that, even if Ms. Parker's position was eligible for telework, she would have denied the request because Ms. Parker's work required review, and because Ms. Parker's workload had been reduced due to a reduced budget for evaluations.

54.     This denial came 212 days after Ms. Parker's initial application for telework and after Ms. Parker expended a great deal of time and effort responding to the additional questions posed by Ms. Winzenburg.  The reasons proffered by Ms. Winzenburg for denying Ms. Parker's request do not reference, and do not justify, the additional burdens Ms. Winzenburg required of Ms. Parker during this process.  Nor do the proffered reasons justify prolonging the process for well over half a year.  To the contrary, if Ms. Parker's position was in fact not eligible for telework, Ms. Parker's request should have resulted in a very short inquiry.

55.     Mss. Elieson and Winzenburg informed the African–American employees that they could not telework if they were sick, but that they would instead have to take sick leave.

56.     Mss. Elieson and Winzenburg treated telework as a benefit that they could withhold from employees they did not like, here the African-American employees.  Mss. Elieson and Winzenburg allowed another EARS staff member, Joyce Moak, who is white, to telework from Mississippi whenever she needed to go there to care for her mother.  In sharp contrast, they denied Ms. Smith the opportunity to telework when she needed treatment for illness, forcing Ms. Smith to take leave without pay.  The telework arrangement for Ms. Moak is not required by

federal law or DOJ policy.   The telework arrangement for Ms. Smith is required by the Rehabilitation Act.  Ms. Smith is African-American.

57.   Ms. Parker's annual performance review for 2013 was completed in February 2014.  Ms. Winzenburg served as the Rating Official for this review and Ms. Elieson served as the Reviewing Official.

58.   Ms. Parker was once more rated against three PE's.  Her rating for each PE, as well as her overall rating, was "Successful."

59.   However, these were not the same PE's against which Ms. Parker had been rated before Mss. Elieson and Winzenburg arrived (*i.e.*, coordinates the EARS pre-evaluation process; provides clerical and administrative support to the Evaluation and Review Staff; plans and executes a variety of special projects and assignments for the program).  Rather, Ms. Parker was now rated against the following three PE's: Pre-Evaluation Support and Office Administration; Customer Service; Professionalism.

60.   On April 8, 2014, Ms. Winzenburg became aware that certain files had been uploaded to the EARS Sharepoint site in error.   Contrary to Ms. Winzenburg's contention, although Ms. Parker physically uploaded the files, the error was not Ms. Parker's.  Ms. Parker's regular duty was to upload the entire file that had been placed in the designated network location. She was not expected to, and did not, review the files before uploading them because that responsibility rested with another employee.   Therefore, Ms. Parker did not know, and could not reasonably be expected to know, that one of the files she was uploading should not be included. Ms. Winzenburg and Ms. Elieson chose to blame Ms. Parker, an African-American, rather than investigating the matter and identifying the employee who actually made the mistake.

61.     As soon as Ms. Parker arrived at the Department of Justice that morning, she was called into Ms. Winzenburg's office and berated for the mistake.  At that point, Ms. Parker did not even know what mistake had been made.  As soon as Ms. Parker went back to her desk, she saw Ms. Elieson enter Ms. Winzenburg's office.  Upset about the previous encounter with Ms. Winzenburg, Ms. Parker followed Ms. Elieson and attempted once again to clarify the situation. Both Ms. Winzenburg and Ms. Elieson were hostile and belittling to Ms. Parker.  Later in the day, Ms. Parker went to talk to Ms. Elieson regarding how she had been treated by Mss. Elieson and Winzenburg that day over a mistake which was not hers.

62.     The next day, April 9, 2014, Ms. Winzenburg assigned Ms. Parker the task of completing 24 letters, which were normally completed by Ms. Smith.  At the time of assignment, Ms. Winzenburg informed Ms. Parker that the letters should be completed by the following Monday, April 14, 2014.

63.     At 5:03 PM on April 10, 2014, Ms. Parker sent the first four letters to Ms. Winzenburg for review.  At 6:58 PM, Ms. Winzenburg responded to Ms. Parker, saying that "there was a typo on the template that no one caught, so all 4 will need to be edited and printed for Dayle [Elieson].  There were a couple of other edits too."  Ms. Winzenburg also changed the due date for the assignment to noon on April 11, 2014.  Because this e-mail was sent after Ms. Parker's working hours, she did not receive it until she arrived the next morning at 8 am.  At that point, she had only four hours to complete the task.  Ms. Winzenburg's intent was clearly to assign Ms. Parker a task she had no chance of completing successfully.

64.     In early April 2014, Ms. Parker first met with an EEO counselor concerning Mss. Elieson and Winzenburg's discrimination.

65.     On April 14, 2014, Ms. Parker received a Notice of Proposed Suspension from Ms. Winzenburg, proposing to suspend her for three days for "conduct unbecoming a federal employee" based on the incident on April 8.  The Notice of Proposed Suspension relied in part on the reprimand Ms. Parker received in 2012. Ms. Winzenburg was aware that Mr. Gibson had caused the reprimand to be removed from Ms. Parker's personnel file.  Thus, Ms. Winzenburg's reliance on that reprimand was improper.

66.     On April 25, 2014, Ms. Winzenburg sent an e-mail to Ms. Parker, with a copy to Ms. Elieson, concerning Ms. Parker's meetings with EEO personnel.  In this e-mail, Ms. Winzenburg questioned Ms. Parker's use of time to meet with EEO counselors and told her that she would need to clear such meetings with Ms. Winzenburg first.

67.     On or about April 25, 2014, Ms. Winzenburg sent an e-mail to the EARS staff regarding a training opportunity that had become available due to the scheduled attendee's illness.  Ms. Parker informed Ms. Winzenburg that she would like to attend.  Ms. Winzenburg told her that she would have to wait to see if someone else wanted it first.  To Ms. Parker's knowledge, no one attended the training.  Ms. Winzenburg thus forfeited the money EARS had already spent on the training rather than allow Ms. Parker to attend.

68.     On May 14, 2014, Ms. Elieson issued a Notice of Suspension to Ms. Parker.  Ms. Elieson's decision tracked Ms. Winzenburg's proposal exactly, including reliance on Ms. Parker's 2012 reprimand.   Ms. Parker served this suspension in July 2014.

69.     On May 30, 2014, Ms. Winzenburg placed Ms. Parker on a Performance Improvement Plan ("PIP"), which claimed that Ms. Parker's work related to PE 1—Pre-Evaluation Support—was "at an unacceptable level."   The PIP recounted a long list of "Performance Deficiencies."   These allegations were either untrue or substantially exaggerated.

Most of the deficiencies were not previously brought to Ms. Parker's attention or were mentioned only casually.  The PIP was obviously intended to create a paper trail to fire Ms. Parker.   One of the "Performance Deficiencies" alleged in the PIP was Ms. Parker's failure to complete the 24-letter assignment on April 11, 2014.  See paras. 62-63 above.

70.     As part of the PIP, Ms. Winzenburg also rescinded Ms. Parker's Alternate Work Schedule ("AWS"), which allowed Ms. Parker to arrange her hours so as to have one day off every fortnight.

71.     Most of the allegations in the PIP relate to events preceding the initial filing of Ms. Parker's EEO complaint.  This strongly supports the conclusion that the PIP constitutes reprisal for Ms. Parker's EEO activities.

72.     On August 8, 2014, the PIP was ended.  Ms. Winzenburg stated that "[a]fter careful review of [Ms. Parker's] performance during the Performance Improvement Plan (PIP) period that began on May 30, 2014, and ended on August, 1 [sic], 2014, I have determined that [Ms. Parker's] performance meets the 'Successful' level."  On November 15, 2014, Ms. Parker received a Notification of Personnel Action that stated her "work performance is at an ACCEPTABLE LEVEL OF COMPETENCE."  However, Ms. Winzenburg refused to allow Ms. Parker to resume her AWS.

73.     On August 27, 2014, Ms. Winzenburg asked Ms. Parker to serve as the EARS representative for the Combined Federal Campaign; this position is supposed to be voluntary.  Ms. Parker demurred, stating that, due to her focus on her primary responsibilities, she did not consider it wise to take on additional responsibilities.  Ms. Winzenburg insisted and Ms. Parker was forced to decline again.

74.     On October 30, 2014, Ms. Winzenburg filed a form to change Ms. Parker's official position description.  Ms. Parker was never informed of this change by her supervisors.  She only learned of it in mid-2015 when she requested certain of her personnel records.

75.     Ms. Parker's annual performance review for 2014 was completed on February 6, 2015.  Ms. Winzenburg served as the Rating Official for this review.  Ms. Parker was rated against three PE's: Pre-Evaluation Support and Office Administration; Customer Service; and Professionalism.  Ms. Parker was rated "Successful" for all PE's.  No overall rating was provided.  During this process, Ms. Winzenburg never suggested to Ms. Parker that her work was unsatisfactory.

76.     Despite the completion of the PIP and Ms. Parker's successful performance review in February, on May 8, 2015, Ms. Winzenburg issued to Ms. Parker a Notice of Proposed Removal from federal service "for unacceptable performance."  The allegations forming the basis for the proposed removal were either erroneous or involved trivial matters.  Moreover, the mistakes made were due to Mss. Elieson and Winzenburg overloading Ms. Parker with substantially more work than she had been assigned in the past, a situation which, along with the stress of working in a discriminatory environment, caused Ms. Parker sometimes to make mistakes that she had not previously made.

77.     Many of the alleged performance deficiencies in the Notice of Proposed Removal pre-dated Ms. Parker's 2014 annual performance review, in which Ms. Winzenburg rated her "Successful" in all PE's.

78.     On August 4, 2015, Ms. Elieson issued a decision letter terminating Ms. Parker from the federal service.

79.     In that decision letter, Ms. Elieson closely tracked Ms. Winzenburg's Notice of Proposed Removal.  Ms. Elieson summarily dismissed Ms. Parker's allegations that Mss. Elieson and Winzenburg have discriminated against her.

80.     Since Mss. Elieson and Winzenburg became Ms. Parker's supervisors, Ms. Parker's health has been significantly affected.  Ms. Parker has had to consult mental health professionals who have prescribed drugs for anxiety and depression.  However, because of losing her job, Ms. Parker has been forced to cease going to such professionals to save funds.  The deterioration of Ms. Parker's health has contributed to whatever mistakes she made.

81.     Although Ms. Parker has diligently searched for new employment since her termination from DOJ, Ms. Parker has repeatedly been humiliated by having to explain to potential employers that she was fired from the DOJ.  That termination, particularly coming from such a prestigious employer, has left an indelible black mark on her resume that has made finding a new job significantly more difficult.

## V

## CLAIMS

### A.     FIRST CLAIM

82.     42 U.S.C. 2000e-16 states that "[a]ll personnel actions affecting employees * * * in executive agencies * * * shall be made free from any discrimination based on race, color, religion, sex or national origin."

83.     42 U.S.C. 2000e-2(a) states that it "shall be an unlawful employment practice for an employer — (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any

16

way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

84.    As set forth above, defendant discriminated against Ms. Parker on the basis of race by, *inter alia*, suspending her, placing her on a Performance Improvement Plan, and terminating her from federal service.  Defendant's stated reasons for these actions were pretext to hide discriminatory animus.

85.    Defendant's actions were intentional and were motivated by Ms. Parker's race.

86.    Defendant's actions caused Ms. Parker loss of pay, loss of retirement and other benefits, medical costs and other pecuniary expenses, physical harm, emotional pain and suffering, mental anguish and anxiety, inconvenience, loss of reputation and professional standing, and other non-pecuniary damages.

## B.    SECOND CLAIM

87.    Section 704 of Title VII of the Civil Rights Act, 42 U.S.C. 2000e-3(a), states that it "shall be an unlawful employment practice for an employer to discriminate against any of his employees * * * because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

88.    The elements of a retaliation claims are that (1) plaintiff engaged in a statutorily protected activity; (2) that the plaintiff suffered an adverse employment action as a result; and (3) a causal connection exists between the adverse employment action and the protected activity.

89.    As set forth above, plaintiff meets all three requirements.  Plaintiff engaged in protected activity by, *inter alia*, initiating EEO counseling and by filing an EEO complaint.

90.     As set forth above, defendant retaliated by, *inter alia*, suspending her, placing her on a PIP, and ultimately terminating her from federal service.

91.     Defendant's retaliation was intentional and a direct result of plaintiff's participation in statutorily protected activity.

92.     Defendant's actions caused Ms. Parker loss of pay, loss of retirement and other benefits, medical costs and other pecuniary expenses, physical harm, emotional pain and suffering, mental anguish and anxiety, inconvenience, loss of reputation and professional standing, and other non-pecuniary damages.

## VI

## RELIEF

Wherefore, Ms. Parker requests the following relief:

1.      Reinstatement in the Department of Justice at the same grade and level of responsibility.

2.      The reversal of Ms. Parker's suspension, reimbursement for all pay and benefits she lost, and the removal from her personnel file of any document relating to the suspension or the facts underlying it.

3.      Reimbursement for all pay and benefits Ms. Parker has lost as a result of her termination and the removal from her personnel file of any document relating to the termination or the facts underlying it.

4.      $300,000 damages for the pain and suffering caused Ms. Parker by the suspension, the PIP, the termination, and the other acts of racial harassment and discrimination against her by Mss. Elieson and Winzenburg.

5.      The attorneys' fees and expenses of her attorneys.

6.      Such other relief as the Court deems equitable and necessary.

# VII

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. Parker demands trial by jury in this action of all issues so triable (*see* 42 U.S.C. 1981a(c)).


Respectfully submitted,

  */s/ Bruce J. Terris*

BRUCE J. TERRIS, Bar #47126
NICHOLAS SOARES, Bar #1015662
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC  20005-4632
(202) 682-2100, ext. 8476

May 6, 2016                                      *Counsel for Plaintiff*